## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| WILLIE MOBLEY | ) | CASE NO. 1:19-CV-02777 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Willie Mobley ("Plaintiff" or "Mobley"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,

42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth

below, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER

CONSIDERATION CONSISTENT WITH THIS OPINION.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

On August 17, 2015, Mobley filed an application for SSI, alleging a disability onset date of October 1, 2009 and claiming he was disabled due to neuropathy, lower back, right hand problems, and right knee.  (Transcript ("Tr.") at 236-44.)  The applications were denied initially and upon reconsideration, and Mobley requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 182-84, 190-94, 195-97.)

On August 21, 2017, an ALJ held a hearing, during which Mobley, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 119-46.)  At his hearing, Mobley amended his alleged onset date to August 17, 2015.[2]  (*Id*. at 121-22.)  On January 17, 2018, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 102-18.)  The ALJ' s decision became final on October 23, 2019, when the Appeals Council declined further review.  (*Id*. at 1-7.)

On November 26, 2019, Mobley filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14-1,15.)  Mobley asserts the following assignments of error:

(1)  The ALJ erred by finding Plaintiff retained the residual functional capacity to perform light work activity without proper consideration of his symptoms.

(2)  The ALJ erred in evaluating the opinion evidence from Plaintiff's treating mental health sources.

(Doc. No. 14-1 at 1.)

---

[2]  Regardless of the actual or alleged onset date of disability, an SSI claimant is not entitled to SSI benefits prior to the date the claimant files an SSI application. *See* 20 C.F.R. § 416.335.

2

## II.  EVIDENCE

**A.    Personal and Vocational Evidence**

Mobley was born in 1969 and was 48 years old, which is defined as a "younger individual age 18-49" under social security regulations, on the date the application was filed.  (Tr. 113.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has a limited education and is able to communicate in English.  (*Id.*)  He has no past relevant work.  (*Id.*)

**B.    Relevant Medical Evidence[3]**

**1.    Mental Impairments**

On July 1, 2015, Mobley, accompanied by his wife, discussed his frustration with limitations due to his diabetes mellitus and its complications and admitted to depression and an interest in counseling with his nurse practitioner, Bernadette Bogdas.  (*Id.* at 378.)

Mobley, accompanied by his wife, underwent a Mental Health Assessment on July 20, 2015 by Benjamin Rubin, L.I.S.W., at MetroHealth's Broadway Behavioral Medicine clinic upon referral from Nurse Bogdas for depression related to diabetes mellitus.  (*Id.* at 484-92.)  He reported a history of auditory and visual hallucinations since childhood, sleep problems, low energy level, daily depression, crying spells, worry, restlessness, and intrusive thoughts and nightmares related to witnessing his father attempting to kill his mother with an axe.  (*Id.* at 486.)  Recent stressors included numerous family deaths.  (*Id.*)  He reported pain in his fingers, legs, and feet at 10, on a scale of 1-10.  (*Id.* at 487.)  Rubin observed him to be well groomed and cooperative, with clear speech, logical thought processes, appropriate language, good recent and remote recall, sustained

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

attention span and concentration, and fair insight and judgment.  (*Id.* at 489.)  Rubin's diagnostic impressions were Mood disorder unspecified, R/O Psychotic d/o and Anxiety d/o unspecified (PTSD-provisional) R/O OCD.  (*Id.*)  He recommended "psychopharm" and therapy services.  (*Id.*)

On October 19, 2015, Mobley and his wife attended a therapy session with Rubin.  (*Id.* at 531-32.)  He reported he was experiencing significant new stressors related to a shooting incident and bullet going through his house.  (*Id.*)  He did not report pain.  (*Id.* at 532.)  Rubin observed him to be well groomed, cooperative, with a normal rate and flow of speech, logical and organized thought process, good judgment and insight, normal memory, sustained attention, appropriate language and full range of affect.  (*Id.* at 532-33.)  Mobley reported ongoing trouble with sleep and exhibited a dysphoric mood.  (*Id.*)

On October 23, 2015, Mobley was evaluated by psychiatrist Vikram Vaka, M.D., at the Behavioral Medicine Clinic.  (*Id.* at 524-31.)  Mobley reported daily depressed mood; anhedonia, feelings of guilt, hopelessness, and worthlessness; low energy; poor concentration; decreased appetite; and poor sleep.  (*Id.* at 524.)  Dr. Vaka observed him to be well groomed and thin; cooperative; with a spontaneous, normal rate and flow of speech; logical and organized thought process; good judgment and insight; normal memory; sustained attention and concentration; and no evidence of paranoia, delusions or perceptual distrubance.  (*Id.* at 527.)  Dr. Vaka also observed he was withdrawn, with depressed mood and constricted affect.  (*Id.*)  There was no change in diagnoses and Dr. Vaka prescribed quetiapine for mood, anxiety and sleep, and educated Mobley about sleep hygiene.  (*Id.* at 527-28.)

On November 9, 2015, Allison Flowers, Psy.D., performed a consultative psychological evaluation at the request of the state agency.  (*Id.* at 616-24.)  Mobley reported difficulties falling

and staying asleep, problems related to nightmares, weight loss, depressed mood, crying spells, irritability caused by his pain, and anxiety about his health.  (*Id.* at 619.)  He had stopped taking his prescribed psychiatric medication after one day, due to side effects.  (*Id.* at 618.)   He reported he was able to take care of his personal needs, but sometimes needed assistance if his feet hurt or were numb.  (*Id.* at 619.)  He cooks and prepares food two or three times a week.  (*Id.*)   He does not perform household chores.  (*Id.*)  He occasionally goes grocery shopping, using a motorized cart, and sometimes drives, but typically is driven by his wife or children.  (*Id.*)  He became tearful when discussing his anxiety symptoms; had some impairment in attention and concentration and showed some mild impairment in attention and concentration, which Dr. Flowers attributed either to pain or distractions created by his 3-year-old son, who was present during the appointment; and was functioning below average intellectually, with a "somewhat limited" general fund of information. (*Id.* at 620.)  Dr. Flowers diagnosed Mobley with adjustment disorder with mixed anxiety and depressed mood, with a guarded prognosis, and noted that diabetes and associated pain could be affecting his mental health and cognitive functioning.[4]  (*Id.* at 621.)  She opined Mobley would have some difficulties in carrying out complex instructions but did not find any limitations in his ability to maintain attention and concentration, perform simple or multi-step tasks, interact, and respond appropriately to work pressures in a work setting.  (*Id.* at 622-23.)

On November 24, 2015, Mobley told Dr. Vaka he felt too sedated on quetiapine, and was losing weight due to his lack of appetite.  (*Id.* at 590-93.)   He continued to have poor sleep, poor appetite, nightmares and depressed mood.  (*Id.* at 592.)  On mental examination, Dr. Vaka found

---

[4]  Dr. Flowers believed that Mobley was not receiving mental health treatment, although she cited records from his mental heathcare at MetroHealth.  She opined that his prognosis "may be improved with mental health treatment.  (Tr. 621.)

5

poor hygiene, depressed mood, constricted affect and fair judgement and insight.  (*Id.*)  All other mental states exam findings were normal.  (*Id.*)  Mobley did not report pain.  (*Id.*)  He stopped quetiapine due to over-sedation and prescribed mirtazapine for depression, anxiety and sleep.  (*Id.* at  593.)

On February 22, 2016, Mobley told Rubin he felt "so so."  (*Id.* at 678.)  He felt his depression was "maybe a bit worse," his anxiety was about the same, his energy was low and he had short term memory problems.  (*Id.*)  He was also in pain.  (*Id.* at 679.)  Rubin found Mobley's mood varied from euthymic to dysphoric, and his mental status examination results were otherwise normal.  (*Id.*)

On March 8, 2016, Rubin and Dr. Vaka completed a joint medical source statement regarding Mobley's mental capacity.  (*Id.* at 626-627.)  They opined Mobley could perform the following tasks occasionally[5] based upon diagnoses of Major Depressive Disorder, recurrent, and PTSD:

- maintain attention and concentration for extend periods of two hour segments;

- deal with the public;

- relate to co-workers;

- function independently without redirection;

- work in coordination with or proximity to others without being distracted;

- deal with work stress;

- understand, remember and carry out detailed and complex instructions;

---

[5]  The form defined "occasionally" as "ability for activity exists for up to 1/3 of a work day."  (Tr. 626.)

6

- socialize;

- behave in an emotionally stable manner; and

- leave home on his own.

(*Id.* at 626-27.)  Additionally, they opined that Mobley's capacity to complete a normal workday and workweek without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods was "rare," meaning it "cannot be performed for any appreciable time."  (*Id.* at 626.)  They explained the basis for this opinion as follows: "Eyes are not so good, major depressive disorder recurrent, PTSD, neuropathy diabetic nerve damage for life, hands-feet-legs-back-arms."

On March 29, 2016, Mobley underwent a second consultative evaluation with psychologist Herschel Pickholtz, Ph.D. (*Id.* at 689-97).  Dr. Pickholtz believed that Rubin was Mobley's prescribing psychiatrist, and that he was not receiving therapy. (*Id.* at 691.)  Mobley reported having mild depressive episodes about twice per month lasting up to 15 hours at a time, and experiencing mild levels of anxiety.  (*Id.*)  Mental status examination revealed "a little bit" of constriction and slowed motor activity, some difficulty in terms of understanding and responding to questions and directives presented to him, some rambling verbalizations with refocus needed, and a "slightly depressed and a little bit anxious" tone of voice and mood.  (*Id.* at 693.)  Mobley reported that, prior to beginning his current psychiatric medications, his depression and anxiety were much worse.  (*Id.* at 694.)  Mobley reported of some ideas of reference[6] and mild auditory and visual hallucinations. (*Id.* at 693.)  Dr. Pickholtz noted that Mobley's overall capacities for attention, concentration,

---

[6] "Ideas of reference" refers to "the sense that events or the actions of others (e.g., talking, whispering, smiling) relate particularly to oneself."  Dictionary, Am. Psychological Assoc., https://dictionary.apa.org/idea-of-reference (last visited 7/15/20).

memory and intellectual levels of functioning based upon the clinical interview and cognitive portion of the evaluation fell within the borderline range.  (*Id*. at 696.)  Dr. Pickholtz diagnosed unspecified mood disorder with mild psychotic feature in partial remission, mild to moderate, and unspecified anxiety disorder with few PTSD symptoms, currently, mild.  (*Id*. at 696-97).  He also recommended that Mobley be medically evaluated to determine whether he had suffered brain damage when he was hit three months prior to the evaluation.[7]  (*Id*.)  He opined that Mobley would have slight impairment in his capacity to understand, remember and carry out instructions for work comparable to what he did in the past, slight impairment in ability to perform one to three-step tasks for low-skilled and unskilled labor, some impairment in his ability to relate to coworkers and others based upon his presentation and description of social interaction, and some impairment in his capacities to handle stresses and pressures of work.  (*Id*.)

On June 23, 2016, Mobley reported to Rubin that his mood was "up and down," and he was experiencing severe knee pain  (*Id*. at 723.)  His mental status exam was within the normal range, and Rubin noted that Mobley seemed to be coping "mildly better."  (*Id*. at 723-24.)

Rubin completed another medical source statement regarding Mobley's mental functioning on July 31, 2017, but noted that he had not seen Mobley for treatment since June 2016. (*Id*. at 750-51). He indicated Mobley had mild limitations in most areas of functioning but had moderate limitations in asking for help when needed, and marked limitations in sustaining an ordinary routine and regular attendance at work and managing his psychologically based symptoms.  (*Id*. at 750-51.)

### 2.      Physical Impairments

---

[7]  Dr. Pickholtz qualified all his findings as accurate "unless there is corroboration of a significant deterioration relative to neurocognitive functioning secondary to him being hit in the head some three months ago."  (Tr. 697.)

8

On July 17, 2013, prior to his alleged onset date, Mobley sought treatment for pain in his legs. (*Id.* at 400-01.)  Primary care physician Amy Zack, M.D., diagnosed neuropathy related to his uncontrolled diabetes, and prescribed a trial of gabapentin.  (*Id*. at 402.)

On September 23, 2013, Mobley reported burning in his legs at night which woke him, and Dr. Zack increased his dosage of gabapentin.  (*Id.* at 398-400.)

On December 1, 2013, Mobley was seen by a nurse practitioner for treatment of foot pain and medication refills.  (*Id.* at 397-98.)  He reported he had bilateral foot pain about three times a week, and had trouble sleeping.  (*Id.*)

On March 26, 2014, Dr. Zack noted Mobley had poor sensation during examination of his feet and increased his dosage of Lyrica.  (*Id.* at 395-96.)

On July 9, 2014, Mobley reported burning in his feet and lower back and Dr. Zack found decreased sensation in his feet and diagnosed neuropathy in his legs and back.  (*Id.* at 393-95.)

On October 31, 2014, primary care physician Rebecca Schroeder, M.D. noted that Mobley's numbness and tingling in his feet were somewhat responsive to Lyrica.  (*Id.* at 385-86.)

On January 30, 2015, Mobley reported numbness and tingling in his hands and feet and requested a higher dosage of Lyrica.  (*Id.* at 383-85.)

On June 17, 2015, Mobley's dosage of Lyrica was again increased after he reported worsening peripheral neuropathy, occurring daily, with numbness, tingling and cold sensation in his feet and fingertips.  (*Id.* at 380-82.)

On July 27, 2015, Mobley had an initial evaluation with Shu Que Huang, M.D., of MetroHealth's Department of Physical Medicine and Rehabilitation, for gradually worsening low back pain radiating to the back of his legs and down to his toes, accompanied by numbness, tingling

9

and weakness in his extremities.  (*Id.* at 373-76.)  Examination revealed a slow gait, very limited lumbar range of motion in all planes due to pain and tenderness in the bilateral paraspinals.  (*Id.* at 376.) Dr. Huang recommended physical therapy, continued use of Lyrica, an EMG/NCV to evaluate peripheral neuropathy and lumbar spine x-rays.  (*Id.* at 376.)

On August 5, 2015, Mobley began physical therapy.  (*Id.* at 472-76.)  He reported diffuse low back pain, which radiated into down his legs into the bottoms of his feet, and worsened when he stood or walked for long periods, climbed stairs, or lay down.  (*Id.* at 473-74.)  He also reported trouble laying down and sleeping at night, difficulty with dressing, climbing stairs and walking or standing for long periods due to pain.  (*Id.* at 474-75.) Examination findings included: reduced lumbar range of motion; decreased strength; positive straight leg raising; positive tenderness to bilateral paraspinals; labored, but independent, transition from sitting to standing and bed mobility; and slow, antalgic gait with decreased trunk rotation.  (*Id.*)

In later physical therapy sessions, occurring in August and September 2015, Mobley reported upper extremity and bilateral feet diabetic neuropathy with some reduction in his low back pain, however even after the reduction, his pain remained "at a high level."  (*Id.* at 367-68, 467, 464-66, 470-71.)

An August 19, 2015 EMG result showed "peripheral neuropathy, mixed axonal and demyelinating, affecting sensory worse than motor fibers, of at least moderate severity overall." Sensory responses were absent in the lower limbs.  The record notes this was a nondiagnostic study with regard to lumbosacral radiculopathy due to limited tolerance  of the needle examination.  (*Id.* at 598, 715.)

10

On October 20, 2015, Dr. Robin Benis, M.D., examined Mobley at the request of the state agency (*Id.* at 509-18.)  Mobley reported a history of diabetes with peripheral neuropathy affecting his hands and feet with severe burning pain, especially in his feet, which caused difficulty standing and walking for long periods, and pain in his right hand and right knee from injuries sustained in a 2009 motorcycle accident.  (*Id.* at 509.)  He told Dr. Benis that he cooked occasionally and helped care for his children, but his wife did all of the cleaning, laundry and shopping.  (*Id.* at 510.) Examination findings were positive for his inability to walk on his toes, and revealed ability to walk on his heels only briefly, ability to perform a limited squat, and mid low back pain with lifting of both legs.  (*Id.* at 510-11.)  Dr. Benis observed he had a normal gait.  (*Id.*)  X-rays of his lumbar spine showed mild disc space narrowing at the L5-S1 level and x-rays of his right hand were normal. (*Id.* at 513-14.)  Dr. Benis opined that Mobley had mild limitations in standing and walking long distances and using his hands due to diabetic neuropathy.  (*Id.* at 512.)

On November 12, 2015, Mobley reported worsening neuropathy which he described as numbness and tingling in his hands, fingers, feet and toes.  (*Id.* at 602-06.)  His dosage of Lyrica was increased to 150 mg twice a day.  (*Id.* at 605).

On November 23, 2015,  Mobley was examined by Dr. Huang.  (*Id.* at 597-602). Mobley described his pain as 10/10 across his lower back and sometimes in both ankles.  (*Id.* at 598.)  Dr. Huang reported that Mobley had moderate to severe diabetic peripheral neuropathy in a stocking-glove pattern than limits him, had an EMG which was limited due to pain and had tried physical therapy and home exercises which were also limited by pain.  (*Id.*)  Mobley stated he could not stand longer than one hour before he started getting pain in his feet and dizziness.  (*Id.*)  Dr. Huang's lumbar examination revealed tenderness with palpation over the L4 and L5 spinous

processes, sacroiliac joint bilaterally and lumbosacral spinal muscles bilaterally, spasm, limited range of lumbar motion, and concordant pain over the lumbosacral paraspinals on testing.  (*Id.* at 600.)  Neurologic examination revealed absent Achilles reflexes bilaterally and absent sensation to light touch over the ball of Mobley's right foot.  (*Id.*)  Dr. Huang increased Mobley's dosage of Lyrica to three times a day.  (*Id.*)

At an April 2016 appointment, Mobley reported significant numbness and neuropathic pain in his both feet and hands, and was noted to be "at risk for falls."  (*Id.* at 699-706).  The doctor referred him for evaluations in endocrinology, optometry and podiatry due to continued numbness and neuropathy. (*Id.* at 703.)

On June 3, 2016, Mobley was treated in the emergency department of the Cleveland Clinic for effusion of the right knee and trigger finger of the left hand.  (*Id.* at 698.)  He was referred for followup with rheumatology and hand surgery.  (*Id.*)

On July 18, 2016, Mobley was treated in the emergency room of University Hospitals for knee pain, underwent diagnostic testing and was prescribed medications.  (*Id.* at 707-09.)

At an August 2016 examination, Mobley reported decreased energy and felt "drained," especially outside in the heat.  (*Id.* at 718-22.)  His score on a patient health questionnaire was indicative for severe depression and he reported that Remeron was not helping as it had in the past. (*Id.* at 719.)

Mobley was examined by Daniel Malkamaki, M.D., who was taking over his care from Dr. Huang, in the MetroHealth Physical Medicine and Rehabilitation clinic on September 16, 2016.  (*Id.* at 714-17.)  He presented with locking symptoms in his upper extremities, much like he had in his lower extremities, and right knee pain.  (*Id.* at 714-15.)  He reported the pain in his right knee and

bilateral hand/feet regions (the latter from peripheral neuropathy) occurred daily, increased with bending, standing and walking and was relieved with medication, rest, change of position and ice or heat.  (*Id.* at 715.)  Examination of the right knee revealed concordant pain with resisted patellar transition during quadricep contraction and moderate to almost severe muscle wasting on the right side compared to the left.  (*Id.* at 716.)  Dr. Malkamaki's impression was Mobley had right knee patellofemoral syndrome and likely some osteoarthritis, bilateral hand and foot peripheral neuropathy symptoms and improved low back pain.  (*Id.* at 716.)  Dr. Malkamaki continued Mobley's medications with only a trial of Naprosyn due to concern about potential kidney issues.  (*Id.* at 717.)

For the remainder of 2016 and in 2017, Mobley followed-up in the MetroHealth Family Practice clinic and continued on the same regimen for treatment of his diabetic polyneuropathy.  (*Id.* at 710-14; 728-40.)  He underwent a diabetic eye examination which revealed nonproliferative diabetic retinopathy without clinically significant macular edema.  (*Id.* at 741-44.)

## C.  State Agency Reports

### 1.  Mental Impairments

On November 19, 2015, state agency reviewing psychologist Tonnie Hoyle, Psy.D., reviewed the record and opined Mobley was moderately limited in the following areas:

- ability to complete a normal workday and work week without interruptions from psychologically based symptoms;

- ability to perform at a consistent pace without an unreasonable number and length of rest periods; and

- ability to respond appropriately to changes in the work setting.

(*Id.* at 157-59.)

13

On April 7, 2106, state agency reviewing psychologist Mary K. Hill, Ph.D., reviewed the record and opined Mobley was moderately limited in the following areas:

- ability to understand and remember detailed instructions;

- ability to carry out detailed instructions;

- ability to maintain attention and concentration for extended periods;

- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

- ability to respond appropriately to changes in the work setting.

(*Id.* at 175-78.)

### 2.     Physical Impairments

On November 17, 2015, State agency reviewing physician Maria Congbalay, M.D., opined that Mobley had the following physical limitations:

- occasionally lifting or carrying 20 pounds;

- frequently lifting or carrying 10 pounds;

- standing and/or walking about six hours in an eight-hour work day;

- sitting about six hours in an eight-hour workday;

- occasionally climb ramps or stains and stoop;

- never climb ladders, ropes, or scaffolds;

- frequently balance, kneel, crouch and crawl; and

- avoid concentrated exposure to vibration and hazards.

14

(*Id.* at 155-57.)

On February 16, 2016, State agency reviewing physician Bradley J. Lewis, M.D., reviewed Mobley's file.  (*Id.* at 173-75.)  He concurred with the exertional limitations in Dr. Congbalay's opinion, but did not find postural limitations in climbing ramps/stairs, kneeling, and crawling nor avoidance of concentrated exposure to vibration.  (*Id.* at 173-75.)

**D.     Hearing Testimony**

During the August 21, 2017 hearing, Mobley testified to the following:

- He was born in 1969, and was 48 years old on the day of the hearing.  (*Id.* at 124.)

- He went as far as eleventh grade in school, and never received a GED.  (*Id.*)

- He has had no reported income for the past 13 years.  He survived by doing odd jobs for cash, and receiving gifts from his mother.  (*Id.* at 125-26.)

- He weighs 161 pounds.  Previously, he weighed 260 pounds, but he has been losing weight rapidly over the past year.   His doctor attributed this to his diabetes.  (*Id.* at 127.)

- His diabetes causes numbness and shooting pains in his feet.  He has to treat his feet with lotion and check them for cuts, because he cannot feel them, and they can become infected without his knowledge.  (*Id.* at 128.)

- His diabetes also causes inflammation and swelling on the right side of his body, including his right knee, and a "pinching, burning" pain from his waist to his shoulder.  (*Id.* at 129.)

- These symptoms make it hard for him to stand.  He wears memory foam inserts in his shoes.  He can stand for no more than 20 minutes.  He can walk four to five minutes before he need to stop.  (*Id.* at 130-31.)

- He has limited flexibility in both hands.  (*Id.* at 131.)

- He can sit for approximately 20 minutes before he needs to get up and walk to ease his pain.  (*Id.* at 132.)

- He has problems grabbing and holding things with his right hand.  He drops things like cups, and once almost dropped his infant son.  (*Id.* at 132-33.)

- He cannot tie shoelaces because of the restricted motion in his fingers.  (*Id.* at 133.)

- He cannot get his blood sugar levels under control.  (*Id.* at 134-35.)

- He has been seeing a therapist to treat his depression and bipolar condition for over a year.  (*Id.* at 136-37.)

- Sometimes, fear prevents him from leaving his house.  He moved his things into the basement because he feels more comfortable there.  He lost his mother and his brother recently, and lost his son in a motorcycle accident.  His daughter was shot in the head, but survived.  Losing so many loved ones has been stressful.  (*Id.* at 137-38.)

- He has mood swings, but has never been hospitalized for his mental illness.  (*Id.* at 138.)

- His pain on a good day is an eight or ten on a scale of zero to ten.  Sometimes the pain is so bad it makes him cry.  (*Id.* at 139.)

- He spends the majority of hi time lying down, trying to reduce the pain. The pain prevents him from sleeping most of the time. (*Id.* at 140.)

-  He has three children under the age of 18, and two of them live with him.  His youngest child is 5 months old.  (*Id.* at 141-42.)

- His wife suffered from alcohol addiction, but received treatment and is now able to work and support the family.  (*Id.* at 142.)

The ALJ then posed the following hypothetical question to the VE:

[Assume a hypothetical individual] 48 today, 11th grade education, no work history with the following limitations and ablities.  This individual would be limited to light exertion; would never climb ladders, ropes, or scaffolds; is unlimited in the climbing of ramps and stairs; unlimited in kneeling and crouching; can occasionally stoop; can frequently balance and crouch; should avoid all exposure to dangerous machinery, and unprotected heights; is limited to work that does not require fast production pace and is routine in nature.

(*Id.* at 143.)

16

The VE testified the hypothetical individual would be able to perform representative "unskilled" jobs in the economy at the "light" level of exertion, such as  a housekeeping cleaner, a sales attendant, and an office helper.  (*Id.*)

The ALJ posed a second hypothetical with different limitations:

Light exertion; never climb ropes, ladders or scaffolds; occasionally climb ramps and stairs; and occasionally stoop; frequently balance, kneel, crouch and crawl; avoid concentrated exposure to vibration and . . . all exposure to operating dangerous moving equipment such as power saws and jackhammers; is limited to work that does not require fast production pace and is routine in nature.

(*Id.* at 143-44.)  The VE testified these limitations did not change his earlier opinion.  (*Id.* at 144.)

In response to questioning from Mobley's counsel, the VE testified that if the hypothetical individual had a limitation to occasional handling, fingering and feeling bilaterally,  there would be no work available.  (*Id.* at 144-45.)  The VE stated that employee absences twice monthly on a regular basis would prevent competitive employment.  (*Id.* at 145.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of

disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since August 17, 2015, the application date;

2.  The claimant has the following severe impairments: spine disorder, diabetes mellitus, depression, and anxiety;

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with the following limitations. The claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally stoop. The claimant can frequently balance and crouch. The claimant should avoid all exposure to dangerous machinery and unprotected heights. The claimant is

limited to work that does not require fast production pace and is routine in nature;

5.      The claimant has no past relevant work;

6.      The claimant was born in 1969 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed;

7.      The claimant has a limited education and is able to communicate in English;

8.       Transferability of job skills is not an issue because the claimant does not have past relevant work;

9.       Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform;

10.     The claimant has not been under a disability, as defined in the Social Security Act, since August 17, 2015, the date the application was filed.

(Tr. 107-114) (citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not

19

review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord

*Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No.

1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  Whether the ALJ erred in finding Plaintiff retained the Residual Functional Capacity to perform work activity

Mobley asserts that the ALJ erred when she concluded that Mobley retained the residual

functional capacity ("RFC") to perform light work, because her RFC determination failed to

adequately account for Mobley's symptoms and the limitations imposed by his peripheral

neuropathy.  (Doc. No. 14-1 at 16.)  He argues that, contrary to the ALJ's assertion that the medical

evidence of record does not support the degree to which he alleges he is physically limited, medical

evidence fully supports these claims.  (*Id.* at 17.)  He asserts that the ALJ overlooked this evidence,

and notes that the evidence that the ALJ cited in support of her opinion included her own

supposition that he probably lifted his three-year-old child in the course of providing parental care.

(*Id.* at 18-19.)

The Commissioner responds that substantial evidence supports the ALJ's determination

of RFC, noting that this is not a high standard and very deferential to the opinion of the ALJ.  (Doc.

No. 15 at 11-12.)  The Commissioner further notes that there is evidence in the record that supports

the ALJ's determination of RFC.   (*Id*. at 18.)

21

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[8]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96  8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96  8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

---

[8] This regulation has been superseded for claims filed on or after March 27, 2017.  As Mobley's application was filed on August 17, 2015, this Court applies the rules and regulations in effect at that time.

It is well established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, No. 16 5175, 2016 WL 4150919, at *6 (6th Cir. Aug. 5, 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin,* No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (accord).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany  Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11 CV 2313, 2013 WL 943874 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Here, the ALJ concluded that Mobley retained the residual functional capacity to perform

"light work"[9] with the following limitations:

> The claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally stoop. The claimant can frequently balance and crouch. The claimant should avoid all exposure to dangerous machinery and unprotected heights. The claimant is limited to work that does not require fast production pace and is routine in nature.

(Tr. 109.)  The ALJ explained the basis for her RFC determination as follows:

> The medical evidence of record does not support the degree to which the claimant alleges he is physically limited. An August 2015 EMG revealed peripheral polyneuropathy, of at least moderate severity overall. However, it was not diagnostic for lumbar radiculopathy (15F/6).  Detracting from the persuasiveness of his arguments is the fact that physical examinations have revealed normal findings (15F, 16F). Instead, these physical examinations findings and the diagnostic tests support the conclusion the claimant is capable of exerting and/or lifting and carrying up to ten pounds frequently and up to twenty pounds occasionally. This is not entirely unreasonable given the fact the claimant has a young child that he more likely than not provides some parental care and supervision that would occasionally require him to lift up the child or carry him. The child was with the claimant when he had his consultative examination with the psychologist (8F).

> The claimant saw internal medical consultative examiner Robin Benis, A.D., in October 2015 (5F).  Upon physical examination, the claimant had normal gait, could not walk on his toes, hard partial squat, normal stance, no assistive devices,

---

[9]  Per 20 C.F.R. § 416.967(b), "light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors, such as loss of fine dexterity or inability to sit for long periods of time." Furthermore, "the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour work day. Sitting may occur intermittently during the remaining time." Social Security Ruling (SSR) 83-10, "Titles II and XVI: Determining Capacity To Do Other Work-The Medical/Vocational Rules of Appendix II."

24

was able to rise from his chair, mid low back pain lifting the right and left leg, normal leg strength and range of motion throughout, and no limitations in his bilateral hands (5F). An x-ray of the claimant's lumbar spine revealed mild disc space narrowing at L5-S (5F/5). An x-ray of the claimant's right hand revealed normal findings (5F/5). The claimant was diagnosed with hypertension, diabetes, neuropathy, right knee pain, and ambulation difficulty (5F/5). Dr. Benis opined that the claimant has mild limitations to standing and walking long distances due to diabetic neuropathy and mild limitations of using his hand due to his diabetic neuropathy (5F/5). The undersigned assigns this opinion partial weight, as it is supported by a detailed examination notes and it is consistent with the medical evidence of record. However, lesser weight because r, [sic] Dr. Benis does not specify the exact functional limitations that would result from the claimant's severe impairments.

State agency medical consultants Maria Congbalay, M.D., and Bradley Lewis, M.D., opined that the claimant could perform light work; never climb ladders, ropes and scaffolds; occasionally climb ramps and stairs and stoop; frequently balance, kneel, crouch, and crawl; and should avoid concentrated exposure to hazards (1A, 3A). The undersigned assigns these opinions considerable weight, as they are supported with detailed explanation from the record and are consistent with the objective medical evidence as a whole.

(Tr. 110-11.)

For the following reasons, this Court finds the ALJ failed to meaningfully address the medical evidence regarding Mobley's neuropathy. Although the ALJ discussed some of the medical evidence, the ALJ failed to address the majority of Mobley's treatment records, she failed to acknowledge or address the abnormal objective findings documented by his physicians, and she misstated the evidence in several respects. As set forth below, the deficiencies in the ALJ's decision are so pervasive and severe as to preclude meaningful appellate review.

In explaining the basis for her RFC determination, the ALJ first cites two sets of medical treatment records, all from MetroHealth, in the period between June 2016 and June 2017. (Tr. 110.) These records document a combination of primary care, mental health care, optometry care and pain management. The ALJ states broadly that the records she cites - which include 18 pages covering

5 month in one instance and 22 pages covering 4 months in another - "revealed normal findings."[10] This is true.  However, they also revealed findings which provide a detailed medical basis for Mobley's claims of impairment in his ability to stand and walk, including "[t]he patient has concordant pain provocated with right knee resisted patellar translation during quadricep contraction. There is moderate to almost severe VMO wasting on the right side compared to the left."  (*Id*. at 716.)

The only record the ALJ identified by page number is from Mobley's September 16, 2016, initial examination by Dr. Malkamaki, who was taking over Mobley's pain management from Dr. Huang.  As the ALJ explains, this record documents that "[a]n August 2015 EMG revealed peripheral polyneuropathy, of at least moderate severity overall. However, it was not diagnostic for lumbar radiculopathy (15F/6)."  (*Id*.)  However, in discussing the EMR Dr. Malkamaki also noted they showed that "sensory responses are absent in the lower limbs."  (*Id*. at 715.)  Dr. Malkamaki explained that the study of Mobley's lumbar radiculopathy had been "nondiagnostic" because Mobley had not been able to tolerate the full needle examination.  (*Id*.) The ALJ did not acknowledge that the record also documents that Mobley was experiencing "locking symptoms" in his upper extremities that was "intermittent, but occurs daily," and pain in his right knee so extreme that he had sought treatment in the emergency room three times.  (*Id*. at 714-15.)  Dr. Malkamaki noted Mobley's pain "increases with bending, standing and walking and is relieved by medication, rest, change of position and ice/heat."  (*Id*. at 715.)

---

[10]  The 40 pages of records cited included mental health, primary care, pain management, and even optometry (Tr. 741-49)

Next, the ALJ referenced the consultative examination of Dr. Benis.  The ALJ gave Dr. Benis' opinion both "partial weight" because of its support and consistency with other evidence, and "lesser weight" because it did not contain specific functional limitations.  Dr. Benis' examination revealed that Mobley had functional mobility limitations including that he could not walk on his toes, could only briefly walk on his heels and could only perform a limited squat.  (Tr. 510.)  The ALJ noted that x-rays of Mobley's right hand were normal, but this is consistent with a diagnosis of neuropathy, which is a disease of the nervous system rather than the skeletal system.  He opined that Mobley would have some limitations in standing, walking long distances and using his hands due to diabetic neuropathy.  (*Id*.)  While Dr. Benis did not specify what he meant by "some" limitation in standing, neither the ALJ nor the state agency reviewing physicians attempted to explain how these findings were consistent with an RFC of light work, which is distinguished from sedentary work by the fact that it "requires a good deal of walking or standing. . . .  for a total of approximately six hours of an eight-hour work day. Sitting may occur intermittently during the remaining time." S.S.R. 83-10, "Titles II and XVI: Determining Capacity To Do Other Work-The Medical/Vocational Rules of Appendix II."

The ALJ instead relied heavily on the RFC determinations of the state agency reviewing physicians who considered the record for the initial determination and reconsideration of Mobley's claim, according them "considerable weight." (Tr. 111.)  However, she references the two opinions as if they were fully consistent, ignoring the differing limitations in climbing ramps/stairs, kneeling, crawling, and avoidance of concentrated exposure to vibration.  (*Id.* at 155-57, 173-75.)  More importantly, both state agency reviewing physicians support their credibility assessment with the broad statement that "MER shows normal gait," although the "Findings of Fact and Analysis of

27

Evidence"in the initial determination includes multiple notations that indicate abnormal findings in these areas, including:

- "ROM was very limited in all plains d/t pain"

- "Gait slow"

- "Decreased strength BLE [bilateral lower extremeties]"

- "Gait independent w/o assistive device, antalgic, slow, and decreased trunk rotation"

(*Id.* at 152-53.)  The "Findings of Fact and Analysis of Evidence" in the reconsideration include the following additional evidence:

- "gait w/o AA, antalgic, slow decreased trunk rotation"

- "Strength 4/5, sensation intact, positive tenderness to bilat paraspinals, SLR bilat positive at 70-80 degrees"

- "Sensory responses are absent in the lower limbs"

(*Id.* at 169-70.)  In fact, only one of the treatment records cited in the earlier decisions records "normal gait."[11]

Other evidence that the ALJ failed to address includes Mobley's consistent report of daily pain, numbness and tingling in his hands and feet.  (*Id.* at 367, 374, 380, 384, 386, 487, 509, 598, 603, 699, 715.)  He repeatedly reported to medical providers that his symptoms were aggravated by prolonged standing and walking, stair climbing, sleeping, and bending.  (*Id.* at 473, 598, 715.)  The medical records indicate the doctors found these reports credible: they repeatedly increased Mobley's dosage of nerve pain medication and reported that other treatment modalities had not been effective.  (*Id.* at 382, 598, 600, 605.)

---

[11]  This finding is also in the consultative opinion of Dr. Benis.

28

While an ALJ need not discuss every piece of evidence, here the ALJ mentioned treatment records which supported the RFC while failing to acknowledge or evaluate treatment records that did not.  As noted above, an ALJ "may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan*, 383 F. App'x at 148 ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also Gentry*, 741 F.3d at 724 (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany Johnson*, 313 F. App'x at 777 (finding error where the ALJ was "selective in parsing the various medical reports"); *Ackles*, 2015 WL 1757474 at *6 ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light.")

Further, instead of considering the testimony and reports of Mobley's activities of daily living in evaluating his symptoms, as required by 20 C.F.R. § 416.929(c)(3), the ALJ substituted supposition.  The ALJ inferred that Mobley "more likely than not . . . occasionally" lifts and carries his "young child" because the child was with Mobley when he had his consultative examination with the psychologist.  (*Id*. at 110.)  The ALJ omitted the significant detail that Mobley's wife - the child's mother - was present for the examination, and was caring for their son, who was 3 years old at the time.[12]  (*Id*. at 619-20.)  The weight of Mobley's son at the time is not noted in the record.  Dr.

---

[12]  Although the child's weight is not noted in the record, the Centers for Disease Control state that an average 3-year-old boy will weigh between 26.5 to 38.5 pounds.  Growth charts, 2 to 20 years: Boys, Centers for Disease Control, https://www.cdc.gov/growthcharts/data/set1clinical/cj41l021.pdf (last visited 7/24/20).

Flowers' report also noted that Mobley sometimes needed help with personal care when his feet were hurt or numb, relied on his wife or older children to drive him to appointments, did not clean his house or do laundry due to his pain, and could only shop with the assistance of a motorized carts, all details which the ALJ omitted.  (*Id*. at 619.)  When asked about his capacity to hold and carry objects in everyday life at his hearing, Mobley testified that he has problems grabbing and holding things with his right hand, cannot tie shoelaces because of the restricted motion in his fingers, and often drops things like cups, and once almost dropped his infant son.  (*Id*. at 132-33.)  The testimony that he had almost dropped a much smaller child is in contrast to the ALJ's supposition regarding his capacity to lift and carry a three year old, and the ALJ provided the Court with no guidance on how to reconcile this contradiction because she omitted reference to the testimony regarding his activities of daily living in her decision.[13]

The Commissioner points out that there is other evidence in the medical record that can be used to support the ALJ's assertions that Mobley had normal gait, strength, manipulative abilities, coordination, range of motion, straight leg raise testing, sensation, and reflexes, and no evidence of atrophy, swelling, or joint deformity.  (Doc. No. 15 at 18.)  However, none of these records were cited by the ALJ.  The Commissioner cannot cure a deficient opinion by offering explanations that

---

[13]  The Commissioner points out that the ALJ stated earlier in the opinion that Mobley was able to prepare simple meals and perform light housework.  (Doc. No. 15 at 19.) This section of the decision references the Function Report filled out by Mobley as part of his initial application on September 23, 2015.  (Tr. 265-72.)  In this report, Mobley states that he can prepare "sandwiches and spaghetti and fries" about once a week, and washes the dishes once a week, with the support of his family, who stand at the sink with him to help him finish.  (*Id*. at 269.)  He also states he sometimes feeds his dog, and sometimes walks her in his yard, but often receives help from his wife and children with these tasks.  (*Id*. at 265.)  Finally, he wrote that he goes shopping for food about once a month. (*Id*. at 270.)  It is not clear how these limited activities support the ALJ's RFC determination, and the ALJ did not provide any explanation of her reasoning.

were not offered by the ALJ.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn*, 2013 WL 3967282 at *8; *Cashin v. Colvin*, No. 1:12 CV 909, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, No. 1:10  CV  02936, 2012 WL 253320 at *5 (N.D. Ohio Jan. 26, 2012).  Further, all but one of the records cited by the Commissioner is from the beginning of the applicable period: 2015.  There is considerable evidence in the record that Mobley's diabetic neuropathy is a progressive condition that was worsening throughout the period at issue.  His condition is described as "worsening neuropathy" in the records cited by the Commissioner, and they clearly document that the impairment worsened in his feet over time, and spread from his feet to his hands.  (Tr. 603.)

The Commissioner is correct that the "substantial evidence" standard is highly deferential to the ALJ.  However, even this deferential standard requires that the ALJ acknowledge evidence that is not supportive of her position, and provide sufficient explanation of her reasoning topermit meaningful appellate review.  As noted *supra*, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet,* 78 F.3d at 307).  *See also Shrader,* No. 11  13000, 2012 WL 5383120 at *6 ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to properly address the evidence of the impact of Mobley's symptoms on his functional capacity, including the evidence indicting that

his impairment was worsening over time.

**B.**      **Whether the ALJ erred in evaluating the opinion evidence from Plaintiff's treating mental health sources**

Next, Mobley asserts that the ALJ did not apply proper legal standards to the opinions of Dr. Vaka and Mr. Rubin expressed in their joint medical source statement, dated March 8, 2016. (Doc. No. 14-1 at 21.)  He notes that the ALJ did not acknowledge Dr. Vaka's joint authorship of the statement, and asserts that she therefore failed to apply the treating physician rule.  (*Id*. at 22.)

The Commissioner responds that Dr. Vaka did not qualify as a treating physician at the time of the opinion, and therefore the ALJ properly weighed the evidence in the medical source statement. (Doc. No. 15 at 13-14.)

As this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Mobley's second assignment of error in depth.  However, Mobley is correct that the ALJ failed to acknowledge Dr. Vaka's co-authorship of the joint medical source statement in her decision, and the ALJ should take the opportunity of remand to correct this error and clarify the rationale behind the weighing of this opinion.

### VII.     CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**

 _s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: July 24, 2020